**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Barry Kendall HOGAN, and Mark Bradford Hogan, Defendants-Appellants.**

**No. 84–1687.**

United States Court of Appeals, Fifth Circuit.

June 7, 1985.

Rehearing Denied Aug. 29, 1985.[*]

---

[*] Cause remanded for limited purpose of making factual determination.

Ronald P. Guyer, San Antonio, Tex., for Barry Kendall Hogan.

Robert G. Turner, Houston, Tex., for Mark Bradford Hogan.

Gerald H. Goldstein, John A. Convery, San Antonio, Tex., for Barry Hogan.

Edward C. Prado, U.S. Atty., San Antonio, Tex., Mervyn Hamburg, Atty., Appellate Sec., Crim. Div., Washington, D.C., for plaintiff-appellee.

Before CLARK, Chief Judge, BROWN, and POLITZ, Circuit Judges.

CLARK, Chief Judge:

### I

Barry Kendall Hogan and Mark Bradford (Brad) Hogan appeal their conviction of importing marijuana and conspiracy to import and possess with the intent to distribute the drug. Because the government called a witness for the primary purpose of impeaching him with otherwise inadmissible hearsay evidence, we reverse.

### II

At a jury trial, the government asserted that the Hogan brothers were implicated in an operation that smuggled marijuana from Mexico into Texas. The fulcrum of the government's proof was the testimony of Mark Carpenter, the pilot of Barry Hogan's airplane, allegedly used in the importing scheme. Carpenter was arrested on October 30, 1979 in Zacatecas, Mexico, shortly after landing at a deserted airstrip where the drug transfer was to occur. Found on the plane was a pouch containing $15,000. A truck parked near the landing strip contained approximately 6,000 pounds of marijuana. Carpenter and the two occupants of the truck were arrested and taken into custody by Mexican officials. A day or so later, Carpenter gave statements to Mexican and United States Drug Enforcement Agency (DEA) officials that implicated the Hogans and himself in the conspiracy. Carpenter remained incarcerated in Mexico for over twenty-eight months.

Following Carpenter's release and return to the United States, he was called to testify before the grand jury in a related case pending in the same court in which the Hogans were later to be tried, but before a different judge. Carpenter initially refused to testify. He was given immunity.

He then denied that he or the Hogans had any involvement in a drug conspiracy and testified that his confessions while imprisoned in Mexico were wholly fabricated and resulted from torture. Carpenter was indicted for perjury, but that matter had not been concluded by the time of the Hogans' trial. The prosecutor in the Hogans' case was informed of Carpenter's reversal of position.

The Hogans filed a motion in limine for permission to argue out of the presence of the jury that any of Carpenter's testimony related to the pending perjury charge was inadmissible. This motion was denied.

At the Hogans' trial, the prosecutor announced during his opening argument that he would call Carpenter, but expected the witness to exculpate the Hogans. This was the prosecutor's remark to the jury:

> We will ... bring you the testimony of ... Mr. Mark Carpenter.... I anticipate that Mr. Carpenter will be a hostile witness to the government. I anticipate in fact that he may testify that he was in Mexico on legitimate business; that in fact the Hogans are not guilty of the crime for which they are charged. And if he made any statements to the effect that they were guilty and that he participated in a marijuana smuggling venture, it was because of the result of torture and mental abuse and physical abuse by the Mexican authorities with the acquiescence of D.E.A. agents in Mexico.... If Mr. Carpenter testifies as I anticipate, we will show his testimony is untruthful. We will bring up [the D.E.A.] agents. We will bring you his prior statements regarding the culpability of himself and his co-conspirators Barry Hogan and Brad Hogan. We will show those statements were made voluntarily.

Following this, but before Carpenter was called to the stand, the Hogans objected to his testifying. They noted that the government admitted it was calling Carpenter for the purpose of impeaching him and asked the court to consider the substantive effect of allowing the jury to hear such evidence. Barry Hogan's counsel stated:

> [T]he impeachment matters ... may not be considered by the jury as substantive proof. But by [the prosecutor] ... calling an adverse witness ... that is going to exculpate my client, ... he still would have the opportunity to get testimony before the jury of ... impeaching matter, which may not be ... used for proof on substantive matters; however, the jury still gets to hear it.

The Hogan's counsel also requested the court to consider this motion in limine. The prosecutor immediately responded:

> I'm calling [Carpenter] because I'm seeking the truth, your honor, and he is a relevant witness and if it requires his impeachment, so be it. Who knows. We will give him the opportunity to testify.

After further argument by counsel, but before adjourning for the day, the court asked the parties to brief the issue of whether Carpenter's immunity would cover testimony under review in his collateral perjury trial. Neither defendant submitted such a brief.

The court permitted counsel for the Hogans to conduct a voir dire examination of Carpenter outside the presence of the jury. During that examination, Carpenter denied involvement in any drug smuggling operation and reaffirmed his grand jury testimony of torture and fabrication. Carpenter then testified before the jury as to these matters, and the witness again maintained that the confessions were coerced. Carpenter also stated that he complained of his abuse to United States Embassy officials during his incarceration.

Defense counsel conducted extensive cross-examination, exploring Carpenter's arrest and the extent of the alleged torture, and eliciting assertions that the Hogans were not involved. In the course of this examination, the defense introduced a 15-minute taped confession of Carpenter given to the DEA agents in Mexico. In the statement Carpenter directly linked the Hogans to the importation scheme.

Following Carpenter's testimony, the government called four DEA and embassy officials to impeach Carpenter's story of

torture and fabrication. They testified that they observed no abuse of the prisoner, nor were they aware of any. In addition, two officials stated that at no time did Carpenter complain of mistreatment. Defendants twice objected to the use of such testimony as hearsay and improper impeachment, but these objections were overruled. The Hogans contend the use of such testimony constitutes reversible error. We agree, for the reasons stated in part III of this opinion.

One other aspect of the trial requires a brief summary. The government elicited testimony from another alleged coconspirator, Boyce Rummel, who testified on behalf of the government in connection with a plea bargain. Rummel directly linked Carpenter and the Hogans to the drug conspiracy. During the investigation of the case, Rummel was interviewed by DEA Agent Braziel for 15 to 20 hours. Braziel took extensive notes of their conversation. According to Rummel, Braziel wrote down many of his statements verbatim and frequently reread portions to Rummel to ensure that he had correctly recorded the facts.

Defendants requested a copy of these notes pursuant to the Jencks Act, 18 U.S.C. § 3500. The government refused to produce the notes, claiming they were not required to be disclosed under the Act. The court accepted the government's assertion and did not conduct an in camera examination of the notes. These notes were later sealed and made part of the record on appeal.

The Hogans also assert that the government waited until three weeks after their trial was concluded to disclose exculpatory material pursuant to their *Brady* request. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Because we reverse their convictions based on the use of Carpenter's impeachment testimony, this issue is now moot. Assuming the material should have been disclosed earlier, the Hogans will suffer no prejudice by its delayed receipt should a new trial occur.

We therefore will not reach the merits of this issue.

### III

The Hogans contend that the government called Carpenter solely to present otherwise inadmissible hearsay testimony to the jury under the guise of impeachment. Defendants claim this "straw-man" ploy violated the Federal Rules of Evidence (FRE), and deprived them of a fair trial.

The government first responds that the Hogans failed to object to the use of such testimony at trial and are therefore estopped from asserting the error on appeal. While the Hogans' objections discussed earlier are not paradigms, they clearly were sufficient to bring the issue to the attention of the trial court and thus preserve this ground for review. The government next contends that the Hogans waived this objection by failing to present authority to the court on the impeachment issue noted above. However, that request for briefing did not encompass the use of the hearsay evidence for impeachment. Thus we decline to hold that the failure to respond constituted a waiver of defendant's objection on this ground.

Next, the government contends that the extensive cross-examination of Carpenter concerning his torture and fabrication constituted a waiver of the objection to the use of such testimony. This contention is not well taken. *United States v. Rios,* 611 F.2d 1335, 1339 (10th Cir.1979); *United States v. Straughan,* 453 F.2d 422, 428 (8th Cir.1972). When, in overruling an objection, the Court expressly sets the direction of trial proof, counsel does not waive the objection by thereafter conducting the defense in accord with the court's ruling.

The remainder of the contentions related to Carpenter's testimony and subsequent impeachment present more substantial issues. The prosecution contends that it has a right pursuant to FRE 607 to impeach its own witnesses. Rule 607 provides, "the credibility of a witness may be attacked by

any party, including the party calling him." In addition, they assert that a prior inconsistent statement of the witness may be admitted to attack his credibility even if the statement tends to directly inculpate the defendant. *United States v. Miller,* 664 F.2d 94, 97 (5th Cir.1981), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982); *United States v. Sisto,* 534 F.2d 616, 622 (5th Cir.1976); *Williams v. United States,* 394 F.2d 821 (5th Cir.), *cert. denied,* 393 U.S. 890, 89 S.Ct. 211, 21 L.Ed.2d 169 (1968). These contentions are correct.

■ The rule in this Circuit, however, is that "the prosecutor may not use such a statement under the guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible." *Miller, supra* at 97 (emphasis in original); *Whitehurst v. Wright,* 592 F.2d 834, 839–40 (5th Cir.1979); *United States v. Dobbs,* 448 F.2d 1262 (5th Cir.1971). Every circuit to consider this question has ruled similarly. *See, e.g., United States v. Webster,* 734 F.2d 1191, 1192 (7th Cir.1984); *United States v. Fay,* 668 F.2d 375, 379 (8th Cir.1981); *United States v. DeLillo,* 620 F.2d 939, 946 (2d Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); *United States v. Morlang,* 531 F.2d 183, 190 (4th Cir.1975); *United States v. Coppola,* 479 F.2d 1153, 1156–58 (10th Cir.1973); *United States v. Michener,* 152 F.2d 880, 883 n. 3 (3d Cir. 1945); *Kuhn v. United States,* 24 F.2d 910, 913 (9th Cir.), *cert. denied,* 278 U.S. 605, 49 S.Ct. 11, 73 L.Ed. 533 (1928).

Despite this consistent precedent, the government contends it has the right to place on the stand a witness whom it suspects will fabricate his story, despite indications by the witness that his story has changed. *See, e.g., United States v. Williams,* 455 F.2d 361, 362–64 (9th Cir.), *cert. denied,* 409 U.S. 857, 93 S.Ct. 140, 34 L.Ed.2d 102 (1972); *United States v. Allied Stevedoring Corp.,* 241 F.2d 925, 932–33 (2d Cir.), *cert. denied,* 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (1957); *United States v. Graham,* 102 F.2d 436, 441–43 (2d Cir.), *cert. denied,* 307 U.S. 643, 59 S.Ct.

1041, 83 L.Ed. 1524 (1939). They assert that in the formal courtroom setting, where the witness must swear an oath before the judge and is subject to the penalties of perjury, the witness is under maximum compulsion to tell the truth. Under these conditions, the factfinder should be allowed to observe the witness's demeanor when confronted with the conflicting statements and decide which version is true. In addition, they point out that if the prosecution could not introduce the testimony of any witness who had once made incriminating statements but later announced that he would recant that story at trial, declarants could effectively negate all incriminating statements made during questioning.

■ The apparent conflict in theories is not real. The government may call a witness it knows may be hostile, and it may impeach that witness's credibility. Surprise is not a necessary prerequisite to impeaching one's own witness under FRE 607. *United States v. Palacios,* 556 F.2d 1359 (5th Cir.1977). *See also Williams,* 455 F.2d at 363; *Graham,* 102 F.2d at 442. The prosecution, however, may not call a witness it knows to be hostile for the *primary* purpose of eliciting otherwise inadmissible impeachment testimony, for such a scheme merely serves as a subterfuge to avoid the hearsay rule.

The danger in this procedure is obvious. The jury will hear the impeachment evidence, which is not otherwise admissible and is not substantive proof of guilt, but is likely to be received as such proof. The defendant thus risks being convicted on the basis of hearsay evidence that should bear only on a witness's credibility. *Morlang,* 531 F.2d at 190. *See also* FRE 403, 404. Limiting instructions can ameliorate a jury's confusion. Because none were requested or given in this trial, we review whether the introduction of Carpenter's testimony and the subsequent impeachment evidence constituted plain error. *Accord United States v. Barnes,* 586 F.2d 1052, 1054–55 (5th Cir.1978); *United States v. Alfonso,* 552 F.2d 605, 617 (5th Cir.),

*cert. denied,* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977). We find that it did.

 The prosecution announced to the jury that Carpenter would be hostile and that it would impeach him. This is not a case where the government needed to determine whether a witness would adhere to his story under oath and subject to perjury. In the cases recognizing the right to put the witness to a trial test, the witness had not testified under oath and subject to perjury. In contrast, Carpenter had already testified twice under oath, and both times he adhered to his account of fabrication. He testified at the grand jury proceedings in a related case and a perjury indictment *and conviction* resulted. He again testified on voir dire in this proceeding. The government was not entitled to another test of Carpenter's sworn testimony. It well knew what he would say under oath.

The government also contends that the primary purpose of calling Carpenter was to link the Hogans to the smuggling operation, and to help solidify in the jury's mind the drug operation, especially because Carpenter was the only conspirator apprehended at the scene of the crime. Again, while these are legitimate purposes for calling a witness, they can not be considered the primary purpose for calling Carpenter in this case. The testimony they knew he would give provided no link between the drug transaction in Mexico and the Hogans other than the undisputed fact that the plane belonged to Barry Hogan and that Carpenter was employed by Hogan. The primary if not sole purpose in calling him to testify again was focused on getting Carpenter's prior statements before the jury.

The government contends that even if its primary purpose in calling Carpenter to the stand was to elicit impeachment evidence, such evidence was independently admissible as substantive proof, and thus the introduction of Carpenter's testimony and the impeachment evidence constituted harmless error. The impeachment proof consisted exclusively of out of court statements offered to prove the truth thereof, and thus

were hearsay. The prosecutor posits for the first time on appeal that this evidence could be admitted under the "catchall" exception to the hearsay rule, FRE 803(24), because it has equivalent guarantees of trustworthiness. We disagree. First, the prosecution failed to provide the Hogans with the required notice that it intended to rely on Rule 803(24) contrary to *United States v. Atkins,* 618 F.2d 366, 372 (5th Cir.1980); and *Johnson v. William C. Ellis & Sons Iron Works, Inc.,* 609 F.2d 820, 823 (5th Cir.1980). Second, at trial the prosecution failed to state this exception as a grounds for admission of the evidence. Instead, the government offered the evidence solely for impeachment. The trial court therefore never made the required findings under the exception concerning materiality, probity, trustworthiness, and conformity with the rules and the interests of justice. *United States v. Guevara,* 598 F.2d 1094, 1100 (7th Cir.1979); *Palacios,* 556 F.2d at 1363 n. 7. It is improper for this appellate forum to make these findings for the first time. *Guevara, supra* at 1100.

The admission of this evidence constituted plain, not harmless, error. Errors in the admission of evidence affecting the substantial rights of a party may be corrected on appeal, even if they were not brought to the attention of the trial court. FRE 103; Fed.R.Crim.P. 52(b). The danger that the uninstructed jury relied on the impeaching statements as substantive proof is great. *Morlang,* 531 F.2d at 190. In addition, in its closing arguments the government relied on Carpenter's hearsay statements to corroborate Rummel's testimony. This request for affirmative use of impeachment testimony as substantive evidence unfairly prejudiced the Hogans. *See also United States v. Hernandez,* 750 F.2d 1256, 1257–58 (5th Cir.1985). The remaining evidence does not so overwhelmingly establish guilt that we could say the error is harmless under Fed.R.Crim.P. 52(a). The convictions of the Hogans must be reversed.

## IV

On retrial it is probable that the district court will again be confronted with two

issues raised here. Therefore, we analyze whether Agent Braziel's investigative notes were discoverable by the defense and examine the court's ruling concerning severance of the trial of Brad Hogan.

### A

The Jencks Act, 18 U.S.C. § 3500, permits a defendant to discover a statement or report made by a government witness once that defendant has testified on direct examination. 18 U.S.C. § 3500(a) and (b). The Act defines "statement" as:

> (1) A written statement made by said witness and signed or otherwise adopted or approved by him;
> (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement....

18 U.S.C. § 3500(e)(1) and (2).

The Hogans first contend that these notes were adopted by Rummel when Braziel continually reread portions to him to ensure their accuracy. Rummel admitted, however, that he never read the entire document. The adoption contemplated by 18 U.S.C. § 3500(e)(1) must be more formal than that presented in this case. *See United States v. Judon*, 567 F.2d 1289, 1292 (5th Cir.1978). The Supreme Court stated in *Goldberg v. United States*, 425 U.S. 94, 110 n. 19, 96 S.Ct. 1338, 1348 n. 19, 47 L.Ed.2d 603 (1976):

> Every witness interview will, of course, involve conversation between the ... [investigating agent] and the witness, and the [agent] will necessarily inquire of the witness to be certain that he has correctly understood what the witness has said. Such discussions of the general substance of what the witness has said do not constitute adoption or approval of the [agent's] notes within § 3500(e)(1), which is satisfied only when the witness has "signed or otherwise adopted or approved" what the [agent] has written. This requirement clearly is not met when

the [agent] does not read back, or the witness does not read, what the [agent] has written.

Because Rummel neither signed, read, nor heard the entire document, these notes fail to qualify as a statement under subsection (e)(1).

Similarly, under subsection (e)(2), the defense can obtain a copy of the document only if it is substantially a verbatim recital of the witness's testimony. Rather than make this determination ourselves, however, we remand this matter to the district court for its consideration should this issue arise upon retrial. The court has a duty to inspect in camera the documents if a timely request is made by the defense and some indication exists in the record that the notes meet the Jencks Act's definition of a statement. *United States v. Gaston*, 608 F.2d 607, 611 (5th Cir.1979); *Judon*, 567 F.2d at 1292. In addition, depending on the facts of the case, the court may need to hear extrinsic testimony to determine whether the notes are verbatim statements. *See Judon*, 567 F.2d at 1291, 1293. The district court will be in a better position to evaluate the nature of these notes. By remanding, we neither make nor imply the slightest intimation as to their character, or the need for extrinsic proof. The district court's determination of this issue is a fact question that will not be overturned unless it is clearly erroneous. *Campbell v. United States*, 373 U.S. 487, 493, 83 S.Ct. at 1356, 1360, 10 L.Ed.2d 501 (1963).

### B

Brad Hogan requested a severance in mid-trial after the prosecution introduced testimony of a prior conviction against Barry for possessing 400 pounds of marijuana. He contended that the jury would unfairly allow such evidence to taint his credibility. Brad notes that far more evidence was presented against Barry than against him, and therefore this prior conviction would have a more substantial prejudicial impact on him. He also contends that the proba-

bility of transference of guilt was heightened because they were brothers.

The general rule is that defendants are to be tried together if their indictments arose out of a common set of circumstances, even if there is a disparity in the quantum of evidence. *United States v. Harrelson*, 754 F.2d 1153, 1174 (5th Cir. 1985); *United States v. Beskowitz*, 662 F.2d 1127, 1135 n. 8 (5th Cir.1981); *United States v. Partin*, 552 F.2d 621, 641 (5th Cir.1977). Denial of a severance will not be reversed unless the defendant can prove he was deprived of a fair trial without severance and can "demonstrate compelling prejudice against which the trial court [was] unable to afford protection." *Harrelson*, 754 F.2d at 1174, *quoting, United States v. Swanson*, 572 F.2d 523, 528 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978).

Appropriate cautionary instructions can decrease the possibility that the jury will improperly transfer proof of guilt from one defendant to another. The court twice so instructed this jury—first, immediately following the introduction of the prior conviction of Barry, and second, in the jury charge.

In light of these cautionary instructions, we are not persuaded that the court erred in refusing to sever. Brad Hogan has not demonstrated that the prior conviction or quantum of proof against Barry, or their status as brothers justifies severance. *Compare Harrelson*, 754 F.2d at 1174–78. The court may, of course, reconsider this issue and reach a different result if other more compelling justification for granting a severance is presented. We hold only that the court's ruling in refusing to grant a severance was proper.

V

Because of the government's improper use of Carpenter's testimony for the primary purpose of subsequently introducing otherwise inadmissible hearsay testimony,

the convictions of Barry Kendall Hogan and Mark Bradford (Brad) Hogan are

REVERSED.