Carlos Lee THURMAN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Carlos THURMAN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Nos. 94–SC–496–MR, 95–SC–1045–TG.

Supreme Court of Kentucky.

May 21, 1998.

Rehearing Denied Oct. 15, 1998.

Melissa Hall, Assistant Public Advocate, Frankfort, John Palombi, Assistant Public Advocate, Department of Public Advocacy, Frankfort, for Appellant.

A.B. Chandler, III, Attorney General, Morris Burton, Commonwealth Attorney, Dina Abby Jones, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, for Appellee.

COOPER, Justice.

Appellant, Demond Bush and Sean Hunter were jointly indicted by a Franklin County grand jury for the murder, kidnapping and robbery of Peggy King. In a separate trial, Bush was convicted of second-degree manslaughter, first-degree robbery, and kidnapping, and was sentenced to fifty years in prison. Hunter pled guilty to second-degree manslaughter and was sentenced to ten years. Following a trial by jury in the Franklin Circuit Court, Appellant was convicted of felony theft by unlawful taking, first-degree unlawful imprisonment, and murder. He was sentenced to serve 109 years in the custody of the Department of Corrections. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

On February 13, 1992, Robert Harlow, an employee of the street department of the City of Frankfort discovered the victim's body near a culvert off Glenns Creek Road. A subsequent autopsy revealed three blunt-force injuries to the head and a .22 caliber bullet in the neck. Because large portions of the neck and facial area had been mutilated by rodent activity, the pathologist was unable to find an entrance wound. However, from the location of the bullet and her knowledge that rodents attack open wounds, she concluded that the bullet entered the right side of the neck below the mandible, struck and fractured the C–2 vertebra, and tore the spinal cord. The bullet wound was determined to have been the cause of death.

Peggy King was a widow who lived alone and was employed as a librarian by the Legislative Research Commission (L.R.C.). She had developed a close friendship with William Wiley, a co-worker at L.R.C., his wife, Sally Wiley, and with the parents of Katherine Stosberg. Mr. and Mrs. Stosberg had divorced and moved away from Kentucky, but their teenage daughter, Katherine, remained in Frankfort and maintained close contact with King. In late 1991, Katherine Stosberg was attempting to break off a romantic relationship with Appellant. In January 1992, she enrolled at Eastern Kentucky University in Richmond, but stayed only two weeks, because Appellant was spending too much time at her dormitory. She then

moved in with her aunt in Lexington, but Appellant continuously telephoned her aunt's house, left notes in her aunt's mailbox, and loitered near her aunt's residence. Because of these problems, Peggy King agreed to let Stosberg move into her Frankfort residence. Stosberg moved into King's home on January 26, 1992. However, she spent that same night with Appellant at his sister's residence in Prince Hall Village apartment complex in Frankfort. During that evening, Appellant displayed to Stosberg a dark, medium-sized revolver. When Stosberg returned to King's home on January 27, she told King she needed to leave Frankfort to get away from Appellant. She made arrangements to visit a friend, Wendy Reich, in Huntington, West Virginia.

On January 28, King put Stosberg on a bus to Huntington. Stosberg had told Appellant she was going to visit Reich and would return on February 4. When she arrived in Huntington, she discovered that Reich was homeless. Both Reich and Stosberg moved into an apartment with another acquaintance of Reich. At that point, neither King nor Appellant would have known how to contact Stosberg, although both Stosberg and Reich notified their mothers where they could be reached. On February 2, 1992, Stosberg called Appellant and informed him that she did not intend to return to Frankfort. She refused to divulge her address.

On February 4, 1992, Peggy King and the Wileys attended a meeting of their country music dance club. King was the treasurer of the club and carried the money in a cigar box which she kept in a black satchel. After the club meeting, King and Sally Wiley had a lengthy conversation regarding their concerns about Katherine Stosberg. King then departed with the expressed intention to return to her home for the evening.

When King did not show up for work on February 5, 1992, William Wiley went to her home to investigate. The house was locked, but he was able to obtain a key. Upon entering, he discovered that all of the lights were on, including the front porch light. King's bed had not been slept in and there were two bowls on the kitchen table, each with a smooth, brownish residue in the bot-

tom. Later, a partially full carton of yogurt was found in the freezer. King's blue 1986 Toyota Tercel automobile was missing. Wiley notified King's son, who lived in Lexington, of these facts, but no other action was taken that day.

On February 6, 1992, a missing person report was filed with the Frankfort Police Department and Sally Wiley accompanied Detective Russell Givens to King's home. Mrs. Wiley also noticed the two bowls on the kitchen table. King's dancing shoes and the black satchel containing the cigar box were found on the stairs. A white sweater, which King had worn on the night of February 4, was found folded in a drawer.

On February 10, 1992, King's Toyota Tercel was found parked on East Third Street in Frankfort. Examination of the interior revealed blood stains on the driver's side seat, the running board, and the left side of the console. Some hair fibers were also removed from the vehicle. The blood stains subsequently were determined to be of King's blood type. Forensic examination of one of the hair fragments revealed it to be a "Negro head hair" similar in color and microscopic characteristics to that of one of Appellant's co-defendants, Demond Bush.

As noted *supra*, King's body was found on February 13, 1992. Between 11:00 and 12:00 p.m. on the night of February 6–7, 1992, and again between 12:00 midnight and 1:00 a.m. on the night of February 12–13, 1992, the maintenance manager at Prince Hall Village saw Appellant and Demond Bush emerge from the woods behind the apartment complex, climb over a six foot high chain link fence separating the woods from the complex, and proceed toward the apartments. The maintenance manager described the area from which Appellant and Bush emerged as heavily wooded and not used for pedestrian traffic. On February 20, 1992, a tree trimmer found Peggy King's purse in this same wooded area.

In addition to the preceding testimony and that to be discussed *infra* with respect to Appellants claims of reversible error, Essie Hunter, sister of co-defendant Sean Hunter, testified that Appellant told her sometime

prior to the discovery of King's body that on the night of February 4, he had asked his brother to give him a ride to King's home; that he and King had talked and each had eaten a bowl of ice cream; that Appellant then asked King if he could use her phone to call for a ride home, and that King had offered to give him a ride; and that when they left King's home, Appellant told her to drive him to Glenns Creek Road. Hunter claimed Appellant did not tell her what happened after that. There was evidence that another witness saw Appellant and Demond Bush driving King's blue Toyota Tercel in south Frankfort after February 4, 1992. Another witness testified that she overheard an argument between Appellant and Michelle Tracy in which Appellant stated, "You will do what I tell you to do or I'll do to you what I did to Peggy, but they'll never find you." Another witness testified that he was present during a conversation between Appellant and Demond Bush in which Bush jokingly referred to going fishing for the gun, but it would never be found; and that Appellant boasted that there was a bullet hole in the head near the back of the neck "that they didn't find."

Yet another witness testified that Appellant told him that Bush killed King with a .22 caliber pistol which Appellant had obtained from his great-uncle in Richmond. Finally, another witness testified that he was present during a conversation between Appellant and Bush in which Appellant stated that he had "capped" (shot) King. In a February 20, 1992 interview with Detective Jack Hazelwood, Appellant stated that Demond Bush had hidden Peggy King's purse in the woods behind Prince Hall Village. The purse was found there later that same day. In an April 3, 1992 interview with Hazelwood, Appellant stated that Demond Bush had told him that he (Bush) went to King's house on the night she was killed and ate a bowl of ice cream. However, in the same conversation, Appellant admitted that Bush did not know King. He also stated that he had read in the newspaper that the killer went to the victim's home, although that information had never been reported in the press.

## I. HEARSAY

Loretta Smith was called as a witness by the Commonwealth. She testified that Appellant came to her apartment in Prince Hall Village at approximately 10:30 p.m. on February 4, 1992 and that he stayed there for one to two hours, during which time he watched television and played cards with Loretta's sister, Christie Smith. She testified that Appellant had a black backpack, which he left at her house, but denied seeing a gun or that Appellant asked her if he could leave the gun with her. When Appellant left the apartment, he told Smith that he needed a place to spend the night and asked Smith's boyfriend, Isaac Johnson, to accompany him to Monika Clay's apartment.

Smith denied giving Appellant any clothes to wear that night. She further denied telling anybody else that Appellant had a gun, that his clothes were bloody, that he said he had disposed of the body of a person he had killed, or that he came back to her apartment and told her he had thrown the gun in the river. Specifically, Smith was questioned about and denied making any statements to Patricia King or April Clark that Appellant had arrived at her apartment wearing a bloody shirt; that she gave him some clothing belonging to Isaac Johnson; that he asked her to keep the gun for him; that he later told her he had disposed of the gun; that he told her he had killed somebody whom he believed to be the aunt of a girl he was dating; and that he had planned to kill her and steal her money, then find the girl.

The Commonwealth then called Patricia King and April Clark as witnesses. Both testified that in November 1992, they were incarcerated with Loretta Smith in the Woodford County jail and were watching television when a news story was presented about the still unsolved murder of Peggy King and the reward being offered for information concerning her death. Both Patricia King and April Clark testified that Smith told them she knew who had killed Peggy King.

Patricia King recalled Smith saying that the man who killed Peggy King was dating a girl who was living with a woman who did not like him, and who had sent the girl away;

that the man told her about putting the body in a van, then taking the car downtown and leaving it; that he came to Smith's house wearing bloody clothes and asked her to get rid of his gun or hide it for him, but that Smith's boyfriend did not want her to get involved. April Clark testified that she asked Smith if the man was named "Carlos" and Smith responded that he was. Clark recalled that Smith told her that "Carlos" had come to her apartment with blood on his shirt; that he had a gun and said that he had just killed somebody; and that he asked her to dispose of the gun and his bloody clothing. According to Clark, Smith told her that she had given the man some of her boyfriend's clothes, but that when he left her apartment, he took the gun with him. Finally, Clark testified that Smith said that Appellant told her (Smith) on another occasion that he had disposed of the body, then had walked down some railroad tracks and thrown the gun into the river.

■ Appellant asserts that all of the evidence offered by Patricia King and April Clark was inadmissible as double hearsay. In fact, only their testimonies regarding statements alleged to have been made by Appellant to Smith was double hearsay. Their testimonies as to what Smith told them that she saw, *i.e.,* the gun and the bloody shirt, and what she did, *i.e.,* gave Appellant some clean clothes, was not double hearsay, but only evidence of Smith's prior inconsistent statements admissible under KRE 801A(a)(1).

■ Although the testimonies of Patricia King and Clark as to what Smith said Appellant told her was double hearsay, such evidence is admissible if each part of the combined statements conforms with an exception to the hearsay rule. KRE 805. Appellant's statements were admissible as admissions of a party. KRE 801A(b)(1). Smith, herself, could have testified to those statements, since she was the person to whom the admissions were made. Smith's statements to King and Clark were admissible as prior inconsistent statements of a witness. KRE 801A(a)(1); *Jett v. Commonwealth,* Ky., 436 S.W.2d 788 (1969). The proper foundation was laid for their admis-

sion by asking Smith if she had made the statements. KRE 613(a). Thus, the evidence presented by King and Clark was admissible even though it constituted double hearsay. *Askew v. Commonwealth,* Ky., 768 S.W.2d 51 (1989).

■ Appellant urges us to adopt the "primary purpose" test formulated by the federal courts for evaluating whether a party may properly impeach his or her own witness under FRE 607. In *United States v. Morlang,* 531 F.2d 183 (4th Cir.1975), it was held that courts must not "permit the government ... to present testimony to the jury by indirection *which otherwise would not be admissible.*" *Id.* at 189 (emphasis added). Other federal courts have referred to this tactic as a "guise," *United States v. Gomez–Gallardo,* 915 F.2d 553, 555 (9th Cir.1990), or a "subterfuge," *United States v. Kane,* 944 F.2d 1406, 1411–12 (7th Cir.1991), used to submit to the jury "otherwise inadmissible" substantive evidence. *Id.See also, United States v.. Ince,* 21 F.3d 576 (4th Cir.1994); *United States v. Carter,* 973 F.2d 1509, 1513 (10th Cir.1992), *cert. denied,* 507 U.S. 922, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993); *United States v. Hogan,* 763 F.2d 697, 702 (5th Cir.1985). On the other hand, it is unnecessary to prove surprise as a prerequisite to the valid impeachment of one's own witness. *United States v. Hogan, supra.* In other words, impeachment is not precluded just because the witness's testimony is consistent with previous statements made to the police, if the witness has made a prior inconsistent statement to another witness. The key issue in the federal cases cited above is whether the jury was exposed to otherwise inadmissible substantive evidence under the guise of impeachment.

The distinction between the use of a prior inconsistent statement to impeach a witness under the federal rules of evidence, as opposed to our rules, is that under FRE 801(d)(1)(A), a prior inconsistent statement is admissible for substantive purposes only if the prior statement was given under oath subject to the penalty of perjury. Otherwise, it is only admissible for purposes of impeachment. Under KRE 801A(a)(1), which codified the holding in *Jett v. Commonwealth,*

*supra,* any prior inconsistent statement of a witness is admissible for substantive purposes. Thus, even if the Commonwealth's "primary purpose" in calling Loretta Smith as a witness had been to impeach her with her prior inconsistent statements, the evidence contained in those statements was not "otherwise inadmissible." *United States v. Morlang, supra. Compare Slaven v. Commonwealth,* Ky., 962 S.W.2d 845 (1997), in which the prior inconsistent statement was "otherwise inadmissible," because the subject matter of the statement was irrelevant.

Even if that were not so, we are not prepared to hold as a matter of law that the Commonwealth's "primary purpose" in calling Loretta Smith to the stand was a guise or subterfuge to introduce her prior inconsistent statements. The other portions of her testimony were relevant to prove Appellant's activities on the apparent night of the murder. There was no evidence that Loretta Smith was related to Appellant or that she was romantically involved with him. Just because she may have given the police false information in a prior unsworn statement would not preclude the Commonwealth from calling her as a witness in the hope that she would tell the truth when placed under oath.

## II. JAILHOUSE INFORMANT

On April 14, 1992, Appellant was arrested on unrelated charges and incarcerated at the Franklin County Correctional Complex (FCCC) where he remained until July 24, 1992. He returned to FCCC on September 3, 1992 and was held there until November 25, 1992. During this second period of incarceration, Appellant was housed in an area known as "D–POD" with approximately twenty other inmates, including Charles Cavins. Cavins testified that in October 1992, Appellant initiated a conversation with him about the death of Peggy King. Cavins testified at a suppression hearing that he told Appellant he should not be discussing such things with anyone. Still, Appellant told Cavins that he and two others had killed King.

On October 26, 1992, Cavins requested a meeting with Bill Read, director of classification at FCCC. Cavins told Read that Appellant had admitted killing Peggy King and agreed to furnish any other information which Appellant might relate to him. Read cautioned Cavins not to initiate any contact with Appellant and not to question or elicit any information from him, but to merely listen and report what he heard. Cavins testified at both the suppression hearing and at trial that he followed these instructions "to the letter." Cavins had seven more meetings with Read in which he furnished Read with information provided by Appellant. On each occasion, Read prepared and submitted a report to the jailer, which was subsequently furnished to the Commonwealth Attorney.

Cavins testified that Appellant told him that he, Demond Bush, and Sean Hunter had abducted King, beaten her, and shot her in the head. Later, he said King was shot in the neck. At first, Appellant stated that it was he who fired the fatal shot, but later stated that Bush was the triggerman. Appellant told Cavins that he disposed of the weapon. Cavins testified that Appellant told him of two possible motives for the killing. First, Appellant asserted that King's children had paid to have her killed for the insurance money. Later, he stated that King was interfering with his relationship with Katherine Stosberg. He also told Cavins that he knew Stosberg had gone to West Virginia and that he had traveled there to look for her. (Wendy Reich's mother testified that Appellant called her on two occasions to ask her for Stosberg's address, but that she refused to give him that information.) Appellant told Cavins he had placed a collect call from West Virginia to Vicky McDonald's home in Frankfort, which he feared was a mistake, because the collect call would show up on McDonald's telephone bill. (McDonald's telephone records indeed revealed that an operator-assisted call was made to her residence from Huntington, West Virginia, on March 5, 1992.) Appellant also told Cavins that he was concerned about McDonald, because she had information which would connect him with King's murder. Cavins further testified that he was present on an occasion when Appellant became angry while talking to someone on the phone. Later, Appellant told Cavins that he was worried

that Bush might turn state's evidence against him.

Following a suppression hearing, the trial judge found that Cavins was not an agent of the Commonwealth at the time of his first conversation with Appellant and that Cavins did not elicit information from Appellant, but only reported what he heard. Appellant's motion to suppress Cavins's testimony was overruled.

Appellant asserts on appeal that Cavins was an agent of the Commonwealth who interrogated him after Appellant had asserted his Sixth Amendment right to counsel. *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In each of those cases, the informant actively engaged the defendant in conversations which elicited incriminating information. Like Cavins, the informant in *United States v. Henry* was a fellow inmate at the institution where the defendant was being held while awaiting trial.

■ In the first place, there is no evidence in this case that Appellant ever invoked his Sixth Amendment right to counsel. His appellate brief cites only to his trial court brief in which he made the unsubstantiated assertion that in late April 1992, Detective Hazelwood took him to his mother's house, and that during this trip, Appellant told Hazelwood that he wanted a lawyer. Even if that were true, Appellant was at that time being held on an unrelated offense. Although he had been previously interviewed about the death of Peggy King, he had not been charged or arrested for that crime. He does not claim that he was not advised of his constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or that he ever invoked his right to counsel during those interviews. The Sixth Amendment right to counsel is "offense specific" and cannot be invoked once for all future prosecutions. *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); *Linehan v. Commonwealth,* Ky., 878 S.W.2d 8, 10 (1994). We held in *Linehan* that if a defendant has

invoked his right to counsel with respect to a first offense and is interrogated without counsel with respect to a second offense, any information obtained in that interrogation tending to incriminate the defendant with respect to the first offense must be suppressed, but incriminating statements relating to the second offense are admissible at the trial of that offense. *Id.*

■ Even if there were evidence to prove that Appellant had invoked his right to counsel prior to his conversations with Cavins, the trial judge's finding that Cavins did not interrogate Appellant, but merely listened to what he had to say, is conclusive of that issue. RCr 9.78; *Crawford v. Commonwealth,* Ky., 824 S.W.2d 847, 849 (1992); *Harper v. Commonwealth,* Ky., 694 S.W.2d 665 (1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). Thus, this case is not controlled by *United States v. Henry, supra,* but by *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). In *Kuhlmann,* the defendant, who was in custody awaiting trial, was jailed with an inmate who had secretly agreed to act as an informant. The informant was instructed to merely listen to the defendant, which he did, and the defendant made spontaneous, unsolicited, incriminating statements to the informant. It was held in *Kuhlmann* that the Sixth Amendment right to counsel does not foreclose "admission in evidence of an accused's statements to a jailhouse informant who was 'placed in close proximity but [made] no effort to stimulate conversations about the crime charged.'" *Id.,* 477 U.S. at 456, 106 S.Ct. at 2628.

> Since "the Sixth Amendment is not violated whenever—by luck or happenstance— the State obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.,* 477 U.S. at 459, 106 S.Ct. at 2630 (citation omitted). Thus, the testimony of Charles Cavins was properly admitted into evidence in this case.

■ Appellant next asserts that the trial judge should have instructed the jury on the weight to be given to Cavins's testimony. He tendered the following instruction, which was refused:

> The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case.

■ Kentucky follows the "bare-bones" principle of instructing juries. *McGuire v. Commonwealth,* Ky., 885 S.W.2d 931, 936 (1994). We have held it to be improper to instruct a jury with respect to the credibility of witnesses or the rules by which the jury should consider specific testimony. *Gray v. Commonwealth,* 252 Ky. 830, 68 S.W.2d 430, 432 (1934); *Stewart v. Commonwealth,* 9 Ky. Opin. 793, 794 (1877). In *Wright v. Commonwealth,* 85 Ky. 123, 2 S.W. 904, 907 (1887), we disapproved instructions which directed the jury's attention to the interest of a witness in the result or character of statements made by him. We continue to adhere to the view that jury instructions should not comment upon the weight and probative value to be given to the testimony of a particular witness. In this case, Cavins's credibility was subjected to vigorous attack during cross-examination and closing argument. The jury was well advised of any benefit Cavins might hope to achieve as a result of his testimony. There was no need to add judicial imprimatur to Appellant's attack on Cavins's credibility.

### III. SPOUSAL PRIVILEGE

On April 25, 1993, Appellant was recaptured after an escape from the Lee Adjustment Center, where he had been incarcerated on other charges. While being held in the Lee County jail on that date, Appellant had a conversation with Officer Danny Thomas of the Beattyville Police Department in which he made several incriminating statements, including that he had married one of the witnesses so that she would not testify against him. In fact, Appellant married Vicky McDonald on May 15, 1992. As related *supra,* there was also evidence that Appellant made a collect telephone call to McDonald from Huntington, West Virginia on March 5, 1992, and that he expressed concern to Charles Cavins that McDonald possessed incriminating evidence against him. McDonald was not called as a witness either by the Commonwealth or by the defendant. Although Detective Givens testified that he interviewed McDonald on two occasions in March 1992, he did not testify to the content of any statements which she made to him. Appellant requested and received a "no adverse inference" jury instruction with respect to the fact that McDonald did not testify in this case. KRE 511(c). Nevertheless, he asserts on appeal that the testimonies of Officer Thomas and Detective Givens, as well as the evidence of the March 5, 1992 telephone call, amounted to impermissible comment upon a claim of spousal privilege. KRE 511(a) and (b).

We note at the outset that there is nothing in this record to prove that the spousal privilege was ever asserted. Neither party subpoenaed McDonald and no hearing was requested or held with respect to an alleged claim of privilege. *Compare Morton v. Commonwealth,* Ky., 817 S.W.2d 218, 223–24 (1991); *Commonwealth v.. Gettys,* Ky.App., 610 S.W.2d 899 (1980). Nevertheless, the issue was preserved by contemporaneous objections to the introduction of this evidence at trial.

■ The spousal privilege has two aspects: (1) a testimonial privilege, KRE 504(a), by which a spouse may refuse to testify, or may prevent the other spouse from testifying against him or her, as to events occurring after the date of their marriage; and (2) a marital communications privilege, KRE 504(b), by which a spouse may refuse to testify, or may prevent the other spouse from testifying against him or her, as to any

confidential communication made by one to the other during the marriage. *See generally Slaven v. Commonwealth, supra,* at 850–856. Since neither aspect of the privilege prevents a spouse from testifying to events occurring or information obtained prior to the marriage, the privilege could not have been invoked with respect to information obtained prior to May 15, 1992. Thus, Detective Givens's testimony that he interviewed McDonald during March 1992 in no way implicates the spousal privilege. Of course, telephone records showing that a telephone call was made to McDonald's residence from Huntington, West Virginia would not implicate the spousal privilege, even if the records showed the call had been made after May 15. The content of the conversation was not introduced. The purpose of this evidence was to verify Cavins's testimony that Appellant said he went to West Virginia to look for Stosberg and placed a long distance call from West Virginia to McDonald's residence in Frankfort.

■ Appellant does not suggest how his own statements to Cavins and Officer Thomas *might* involve the spousal privilege. His statement to Officer Thomas that he married McDonald to keep her from testifying against him was independently relevant as evidence inconsistent with his innocence, thus akin to an admission of guilt. "Any attempt to suppress a witness' testimony by the accused ... is evidence tending to show guilt." *Foley v. Commonwealth,* Ky., 942 S.W.2d 876, 887 (1996). That Appellant's *motive in* marrying McDonald was other than true love was supported by evidence of his infatuation with Katherine Stosberg, his intimate relationship with Monika Clay, and a statement he made to Detective Hazelwood on April 3, 1992 that he *intended to marry* Michelle Tracy. Appellant's statement to Charles Cavins to the effect that McDonald possessed evidence which would incriminate him in this murder was not an improper comment upon a claim of spousal privilege, but an admission by Appellant *tending to prove his guilt* of this crime. KRE 801A(b)(1).

## IV. WEAPONS EVIDENCE

■ Warren Mitchell, a firearms examiner for the Kentucky State Police, testified that the bullet retrieved from Peggy King's body was a .22 long rifle caliber bullet capable of being fired from numerous makes and models of firearms, both revolvers and rifles. Mitchell testified that during the course of the investigation of this crime, five .22 caliber handguns were submitted to him for forensic examination and he determined that none was the murder weapon. Appellant moved *in limine* to suppress this evidence and that motion was granted. However, during the course of the trial, Appellant withdrew his objection and his counsel stated on the record that if the Commonwealth did not introduce this evidence, he would introduce it. Having thus waived that issue, he is precluded from raising it on appeal.

■ Anita Handley testified that she witnessed Appellant purchasing a box of bullets at a pawn shop in late January 1992. Katherine Stosberg testified that Appellant displayed a medium-sized dark revolver to her on January 26, 1992. Patricia King and April Clark testified that Loretta Smith told them Appellant had a gun when he came to Smith's apartment on the night of February 4, 1992 and asked Smith to hide or dispose of it for him. Appellant spent the night of February 4–5, 1992 with Monika Clay. After he left the following morning, Clay found a medium-sized pistol wrapped in a pair of suede gloves under her bed. She called Appellant's mother and left a message for Appellant to contact her. Appellant later appeared at Clay's apartment, identified the pistol as being his, and told Clay not to tell his mother that he had a gun. Appellant then departed with the gloves and the gun. Missy Whitehouse testified that Appellant brought a black, medium-sized loaded revolver into her vehicle a few days after February 4, 1992. There was no contemporaneous objection to any of this testimony. KRE 103(c)(1); RCr 9.22.

Peggy King was killed by a bullet fired from a .22 caliber weapon which the firearms expert testified could have been a revolver. There was evidence that Appellant had obtained a .22 caliber pistol from his great-uncle in Richmond. There was evidence that Appellant admitted on several occasions that

he shot King and disposed of the weapon. Detective Hazelwood testified that when he interviewed Appellant on April 24, 1992, Appellant wrote ".22 Cal." on a piece of paper, told Hazelwood that was the gun he was looking for, then placed the piece of paper in his mouth and swallowed it. Under these circumstances, evidence that Appellant was in possession of a medium-sized revolver before, after, and during the evening of February 4–5, 1992 was relevant evidence. KRE 401; *cf. Arnett v. Commonwealth*, Ky., 470 S.W.2d 834, 837 (1971). The only issue would have been whether the probative value of this evidence was substantially outweighed by the danger of undue prejudice. KRE 403. The cumulative facts of this case would have justified a finding that the probative value of this evidence was not outweighed by its prejudicial effect. However, since no objection was made to this evidence, the trial judge was never called upon to make that determination.

## V. INMATE CORRESPONDENCE

■ On December 29, 1992, Appellant wrote a letter to Demond Bush, which was intercepted by personnel at the Franklin County Correctional Complex and subsequently delivered to prosecuting authorities. After redaction, the following portion of the letter was read to the jury:

What's up? Let me tell you what the word is. The word is that you turned state's evidence on Sean. It's not coming from people on the street. It's coming from the detectives. Detective Hazelwood told Brenda, Sean's mom, that you turned in state evidence. Look, you sit down today and write me. Not tomorrow, today! and let me know what's going on. The detective told Brenda he was getting ready to drop the bomb on three people. He didn't say any name. I haven't heard from Sean but he's going to write me back this week. Don't go out like no sucker, man. You are better than that, you dig. You know they are trying to hang all three of us for nothing. I'm hearing more and more s— everyday. I gotta go. Write back today.

Appellant asserts that the letter was "outgoing" correspondence from him to Demond Bush while Appellant was incarcerated at FCCC and Bush was incarcerated somewhere else. The significance of this assertion appears to be that OAG 65–475 opines that a jailer is entitled to censor all *incoming* mail addressed to prisoners in a county jail, and can transfer information contained in that mail to prosecuting authorities when there is a legitimate mutual interest. (In fact, the authorities cited in that opinion can be interpreted as authorizing interception of incoming or outgoing mail of a prisoner.) The uncontradicted testimony of Bill Read was that Appellant was transferred out of FCCC on November 25, 1992. If so, the letter must have been sent by Appellant from another penal institution to Bush, who remained incarcerated at FCCC, thus was "incoming" mail. Since both Appellant and Bush were incarcerated, we perceive it to be a difference without a distinction whether the correspondence was seized as outgoing mail at Appellant's place of incarceration or incoming mail at Bush's place of incarceration. Either way, we agree with the Commonwealth's assertion that inmates have no absolute right to send letters to other prisoners. *Accord Turner v. Safley*, 482 U.S. 78, 91–93, 107 S.Ct. 2254, 2263–64, 96 L.Ed.2d 64 (1987); *Procunier v. Martinez*, 416 U.S. 396, 412–13, 94 S.Ct. 1800, 1810–11, 40 L.Ed.2d 224 (1974); *Meadows v. Hopkins*, 713 F.2d 206 (6th Cir.1983).

Kentucky Corrections Policies and Procedures (CPP) 16.2, IV.B(2), incorporated in 501 KAR 6.020 § 1(3), provides that all incoming mail, except that which qualifies as privileged, "shall be opened and inspected or read to determine if Contraband is enclosed or any violation of prison rules has occurred." Upon arriving at Kentucky penal institutions, inmates are advised that their outgoing mail is subject to being inspected and read. CPP 16.2, IV.A(6)(b). In *Meadows v. Hopkins, supra*, at 210–11, the Sixth Circuit Court of Appeals upheld a United States Bureau of Prisons regulation authorizing prison staff to read incoming and outgoing "general correspondence" of inmates. Bill Read testified that the FCCC policy in effect in December 1992 was to open and inspect all incoming mail for contraband and security reasons. Outgoing mail was also subject to inspection

when it raised security concerns. Inmate-to-inmate mail, especially incoming correspondence, was more closely scrutinized. These policies were even less restrictive than those approved in *Meadows v. Hopkins, supra.* No First Amendment violation occurred as a result of the opening and inspection of Appellant's correspondence with Bush.

■ Nor does the policy of providing seized correspondence to prosecuting authorities violate the Fourth Amendment proscription against unreasonable searches and seizures. In *Stroud v. United States,* 251 U.S. 15, 21–22, 40 S.Ct. 50, 52–53, 64 L.Ed. 103 (1919), it was held that letters voluntarily written by an inmate, without threat or coercion, which are intercepted by prison guards pursuant to established practice designed to protect the facility and promote security, may be provided to prosecutors for use at trial. *See also United States v. Kelton,* 791 F.2d 101, 102–03 (8th Cir.1986). Appellant's constitutional rights were not violated by the interception, seizure and subsequent use at trial of his December 29, 1992 letter to his co-defendant.

## VI. CHANGE OF VENUE

■ Appellant filed a pre-trial motion for a change of venue premised primarily upon the amount of publicity which surrounded the disappearance of Peggy King, the subsequent discovery of her body, and the lengthy investigation of her murder, including offers of rewards by family and friends. In support of his motion, Appellant filed a "venue survey," which proved that citizens of Franklin County were more familiar with his case than were citizens of Warren County, the location to which Appellant apparently desired to have his case removed. His motion was denied.

The mere fact that jurors may have heard, talked, or read 'about a case is not sufficient to sustain a motion for change of venue, absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant. Prejudice must be shown unless it may be clearly implied in a given case from the totality of the circumstances.

*Montgomery v. Commonwealth,* Ky., 819 S.W.2d 713, 716 (1991); *Brewster v. Commonwealth,* Ky., 568 S.W.2d 232, 235 (1978). "It is not the amount of publicity which determines that venue should be changed; it is whether public opinion is so aroused as to preclude a fair trial." *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384, 387, *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986). These cases find their genesis in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and identify three elements which indicate when a change of venue is necessary: (1) There has been prejudicial news coverage; (2) the news coverage occurred prior to trial; and (3) the effect of such news coverage is reasonably likely to prevent a fair trial.

In overruling the motion, the trial judge noted that it had been almost two years since the bulk of the publicity about the case had appeared. Ultimately, he found that, "prejudice against the defendants has not been shown and cannot be 'clearly implied ... from the totality of the circumstances,' " citing *Brewster v. Commonwealth, supra,* at 235. There was substantial publicity that Peggy King had been murdered and that Appellant and two others were accused of that murder. However, all potential jurors necessarily would be apprised of those facts within minutes after court was opened on the first day of trial. The real issue is whether the jurors were prejudiced by their exposure to that information to the extent that it was unlikely that Appellant could receive a fair trial. KRS 452.210.

During *voir dire,* all but four of the first twenty-nine prospective jurors had heard or read something about the case. However, none professed to have formed an opinion as to the guilt or innocence of Appellant or to have talked to anyone who had expressed such an opinion. Only two of the twenty-nine had been acquainted with Peggy King and both were excused. Two additional venirepersons, who had not been called as prospective jurors for this case, were excused as potential jurors after advising the judge and the attorneys in private that they were employed at L.R.C. and had known King. Other prospective jurors excused for cause includ-

ed: (1) a person who shared office space with a friend of the victim; (2) a former employee of defense counsel who had discussed the case with him; (3) an employer whose employees were good friends of Appellant; (4) a good friend of Appellant's brother; (5) a person who formerly worked with Vicky McDonald and thought Appellant had married McDonald to prevent her from testifying; and (6) another person who had heard that Appellant married a witness to prevent her from testifying and had subsequently divorced her. Appellant does not claim the judge denied any of his motions to strike jurors for cause because of their knowledge of the case.

A trial judge's decision not to change venue "is given great weight because he is present in the county and presumed to know the situation." *Nickell v. Commonwealth,* Ky., 371 S.W.2d 849, 850 (1963). The ease with which an impartial jury was selected in this case is convincing that the trial judge's perception that Appellant could receive a fair trial in Franklin County was correct. Thus, there was no error in his denial of Appellant's motion for a change of venue.

Accordingly, the judgment entered and the sentences imposed by the Franklin Circuit Court in this case are affirmed.

STEPHENS, C.J., and GRAVES, JOHNSTONE and WINTERSHEIMER, JJ., concur.

STUMBO, J., dissents by separate opinion with LAMBERT, J., joining that dissent.

STUMBO, Justice, dissenting.

In *Jett v. Commonwealth,* Ky., 436 S.W.2d 788 (1969), this Court laid the foundation for the opinion it renders today. Therein we said it is permissible to impeach a witness with a prior unsworn statement that is inconsistent with the testimony given on the stand. Further, we said that the unsworn statement can be considered by the jury as substantive evidence, a position few, if any, other jurisdictions have followed. In the federal system, the prior statement, if unsworn, cannot even be considered for purposes of evaluating the veracity of the witness. The reason for this prohibition is clearly set out in *United States v. Ince,* 21 F.3d 576 (4th Cir.1994):

We must be mindful of the fact that prior unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof. The introduction of such testimony, even where limited to impeachment, necessarily increases the possibility that a defendant may be convicted on the basis of unsworn evidence, for despite proper instructions to the jury, it is often difficult for jurors to distinguish between impeachment and substantive evidence.... Thus, the danger of confusion which arises from the introduction of testimony under circumstances such as are presented here is so great as to upset the balance and [to] warrant continuation of the rule of exclusion.

*Id.* at 580 (quoting *United States v. Morlang,* 531 F.2d 183, 190 (4th Cir.1975)).

For reasons that seemed valid in 1969, this Court declined to conserve the prohibition against using hearsay as an impeachment tool and, going further, allowed the hearsay, unsworn testimony not subject to cross examination, to be considered by the jury as substantive evidence. Now we take a further step. By virtue of this opinion, the majority further extends the *Jett* doctrine by holding that a witness may now be called for the sole purpose of impeaching another witness with his or her prior inconsistent statements. As noted in *United States v. Webster,* 734 F.2d 1191, 1192 (7th Cir.1984):

It would be an abuse of [Federal Rule of Evidence 607], in a criminal case, for the prosecution to call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence—or, if it didn't miss it, would ignore it. The purpose would not be to impeach the witness but to put in hearsay as substantive evidence against the defendant, which Rule 607 does not contemplate or authorize.

The fourth circuit, in *United States v. Morlang,* 531 F.2d 183, 190 (4th Cir.1975), stated that "[t]he overwhelming weight of authority is, however, that impeachment by

prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible." Sadly, in the Commonwealth of Kentucky, this subterfuge is permitted, if not encouraged, by the adoption of KRE 801–A (a)(1). The unfairness of this tactic and the tragic neglect of the rights of confrontation and cross-examination are ignored. I not only dissent from this opinion, but I would overrule *Jett v. Commonwealth* and amend the Kentucky Rules of Evidence to remove all reference to *Jett.*

LAMBERT, J., joins this dissenting opinion except as to the suggestion that *Jett v. Commonwealth* be overruled, but believes that it should not be extended.