# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: FEBRUARY 20, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0166-MR

STANFORD SHELTON                           APPELLANT

V.              ON APPEAL FROM GRAVES CIRCUIT COURT
HONORABLE TIMOTHY A. LANGFORD, JUDGE
NO. 19-CR-00321

COMMONWEALTH OF KENTUCKY             APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

Stanford Shelton entered a conditional guilty plea to second-degree manslaughter, complicity to attempted murder, being a convicted felon in possession of a handgun, and being a first-degree persistent felony offender (PFO 1st). As a condition to his guilty plea, he reserved the right to appeal the issues raised herein. He also raises an alleged sentencing error. After review, we affirm the circuit court's rulings in all respects save for its classification of Shelton as a violent offender pursuant to KRS[1] 439.3401. We accordingly vacate Shelton's sentencing order and remand for entry of a sentencing order consistent with this opinion.

---

[1] Kentucky Revised Statute.

## I. FACTS AND PROCEDURAL BACKGROUND

Shelton entered his conditional guilty plea after the completion of both the Commonwealth's and the defense's proof, but prior to closing arguments. The evidence presented during trial is needed for context to address the issues raised by Shelton on appeal and can be reasonably summarized as follows.

Shelton was a member of the Vice Lords, a street gang that originated in Chicago, Illinois with active chapters throughout the United States. Shelton's maternal first cousin, Dimetri Ross, was also a member of the Vice Lords as was Ross' paternal first cousin, Jerrod Dale.[2] As is common in criminal organizations, the Vice Lords have a rigorously adhered to pecking order. Dale was a "chief," making him the highest-ranking Vice Lord in Kentucky. Because he was a chief, Dale's rank within the gang was classified as "5 universal elite" or "5UE." Shelton was a "3UE," meaning he had some authority over other members of the gang but was still considered Dale's subordinate. Ross' rank was "MOL" or "master of literature" meaning he was the person responsible for ensuring that the members he associated with followed the Vice Lord's code of conduct. Ross was outranked by both Dale and Shelton.

During late spring 2019 Dale lived in a small house that had been converted into a duplex on Lee Street in Mayfield, Kentucky. Dale lived in apartment 704 on the right side of the duplex while the victim in this case, Savannah Hancock, lived with her husband in apartment 702 on the left side

---

[2] Jerrod Dale's name is stated various ways throughout the record including Gerrod Dale, Jerrod Powell, and Gerrod Powell.

of the duplex.  Neither Savannah nor her husband had any affiliation with the Vice Lords.

Several witnesses testified that sometime prior to May 2019, both Shelton and Ross began having "beef" with Dale.  Tayvon Carman and Cameron Evans were both lower-ranking members of the Vice Lords that lived at the Budget Inn in Mayfield.  Tayvon spent a lot of time with both Shelton and Dale.  He claimed that Shelton and Dale began having issues when Dale cut Shelton out of the gang's drug trade after discovering that Shelton had slept with a woman named Brandy.  In addition, Dale told Tayvon that Shelton was trying to kill him (Dale) so that Shelton could take his rank within the gang.  Tayvon stated that Ross' issues with Dale were the result of Dale finding out that Ross was hanging out with Shelton.  Cameron maintained that the issues between Shelton and Dale started after Dale and Ross took a trip to Chicago in April 2019 to meet with Vice Lords that outranked Dale.  During that trip the powers that be within the gang informed Dale that he was in fact not a chief and instructed him to stop claiming that he was; a power struggle then ensued between Dale and Shelton.  Cameron claimed Ross was also angry with Dale upon discovering he was not a chief.

Gwynth Turner was friends with Shelton and Ross.  She stated that Shelton and Dale were fighting over Brandy and further asserted that Shelton told her he wanted to kill Dale so that he could assume Dale's status within the gang.  Hayden Dunigan, Ross' then-girlfriend, believed the issues between Shelton, Ross, and Dale were because Dale owed Ross money for drugs.  Kayla

3

Troup, Shelton's then-girlfriend, maintained that Shelton and Dale had several arguments over Brandy and that they had many gang related issues because Shelton felt he should have had a higher rank. Ross himself claimed that he had problems with Dale because Dale made a pass at the mother of Ross' child and had attempted to pay her money to set Ross up. Ross further asserted that Shelton and Dale were fighting over Brandy.

Whatever the reason for the disdain Shelton and Ross had for Dale, the situation reached a breaking point on May 12, 2019. That night, Shelton and Ross were partying at Gwynth's home with her and Ashton Gipson, Gwynth's friend. Shelton asked Gwynth if she would take him to drop off diapers at his child's mother, Misty Shelton's, house. The four of them took Hayden's car[3]; Gwynth drove, Shelton was in the front passenger seat, Ashton was in the back driver's side seat, and Ross was in the back passenger side seat.

Instead of going to Misty's house, they drove past Dale's house. The first time Gwynth drove past the house Shelton called her "a stupid b*tch" for driving too fast and demanded that she drive past it again, but more slowly. She circled the block and drove past the home again at which point Ross fired shots at the house. It was undisputed that Shelton did not fire any shots during the May 12 drive-by. However, Gwynth claimed that she saw Shelton hand Ross a gun at some point while they were in the car. Ross disputed this and claimed he directed Gwynth to go to Dale's house, that Shelton did not

_____

[3] According to Hayden, Ross would often take her car without her consent.

4

know he intended to shoot at Dale's house, and that Shelton did not provide him with a gun. No one was injured during the May 12 shooting.

The next drive-by shooting occurred on or about June 15, 2019.[4] Marcia Powell, an acquaintance of Shelton, Ross, and Dale, stated that on the night of this shooting she went from the Budget Inn where she was living to the Windhaven Apartments with several people. While she was there someone got a call from Shelton who said he had a situation with Dale that he needed help with. Marcia then went from the Windhaven Apartments to the 5th Street Apartments and got into a car there with Shelton, Ross, and Jodeci Willie.

Marcia drove, Jodeci was in the front passenger seat, Shelton was in the back driver's side seat, and Ross was in the back passenger side seat. Marcia was told they were either going to pick something up or drop something off at Dale's house, while Jodeci remembered them saying they were going "to pick up" at Dale's house. After Marcia drove by Dale's house the first time Shelton told her to slow down, so she turned around and drove past it a second time at which point someone in the backseat began firing shots at the house. Marcia did not know if Shelton or Ross fired the shots. Jodeci likewise did not know who fired the shots, but believed it sounded like two different guns were being fired. Ross denied any involvement with the June 15 drive-by. No one was injured because of that shooting.

---

[4] The Commonwealth conceded it could not pinpoint the precise date of this incident, but knew that it occurred shortly before the June 18, 2019, shooting.

The final incidents at issue occurred on June 18, 2019. Late that evening Hayden was babysitting for Robin Moxey at Robin's home on South 6th Street in Mayfield. Hayden was sitting in her car in front of Robin's home unsuccessfully attempting to break up with Ross over the phone. Shelton drove up to Robin's house, exited his vehicle, walked up to Hayden's car, and began talking to her. Within ten minutes of Shelton's arrival, two individuals in black ski masks began shooting at Shelton and Hayden. Hayden and Shelton were both unharmed and left the scene in their respective vehicles before the police arrived. Shelton picked up Kayla and Ross and then began trying to get Hayden to meet him somewhere. Hayden was reluctant but agreed to meet Shelton in a large parking lot between a McDonald's and a Pocket's gas station.

When they arrived in the parking lot, Shelton and Ross got in the car with Hayden. Hayden drove, Shelton was in the front passenger seat, and Ross was in the back passenger seat. Hayden stated that Shelton was very angry about being shot at and believed Dale was responsible for the shooting. Hayden began driving towards Shelton's home in Wingo with the hopes of leaving him and Ross there when Shelton pulled a gun on her and told her to drive to Dale's house. The first time Hayden drove past Dale's house she intentionally drove too fast; Shelton became irate with her and told her to "turn around and do it right." She circled the block and drove past the house a

second time at which point Shelton fired at least four shots at it with a 9mm handgun.[5]

When Shelton fired shots at the duplex twenty-three-year-old Savannah and her nine-year-old stepdaughter, Jane,[6] were in the living room at the front of the apartment. Jane was sitting in the floor between Savannah's legs while Savannah braided her hair. One of the bullets Shelton fired went through the apartment's glass screen door and wooden front door and struck Savannah in the neck. Upon hearing the loud noise of the bullet hitting the front door, Jane ran to the back of the house. After Jane realized Savannah had not followed her, she walked back into the living room and found Savannah alive but bleeding from her neck and unable to communicate. Jane found Savannah's cellphone and called 911. Savannah was taken to a hospital in Indiana where she died two days later. Both Ross and Hayden pled guilty to charges related to their involvement in Savannah's murder prior to Shelton's trial. Shelton did not testify on his own behalf.

Additional facts are discussed below as necessary.

## II.    ANALYSIS

### A. The circuit court erred by finding that Shelton qualified for violent offender status.

Shelton first asserts that the circuit court erred by classifying him as a violent offender pursuant to KRS 439.3401. The Commonwealth agrees and

---

[5] The handgun was never found by law enforcement.

[6] As Savannah's stepdaughter is a minor, we utilize a pseudonym to protect her anonymity.

7

has no objection to Shelton being resentenced properly. The violent offender statute mandates that defendants who are convicted of or plead guilty to certain offenses enumerated within the statute are ineligible for parole until they serve eighty-five percent of their total sentence. *See generally* KRS 439.3401.

As noted above, Shelton entered a conditional guilty plea before the proof in this case was submitted to the jury. The charges Shelton initially faced under indictment 19-CR-321[7] were complicity to attempted murder for the May 12th shooting, attempted murder for the June 15th shooting, murder for the June 18th shooting, possession of a handgun by a convicted felon, and PFO 1st. In exchange for his guilty plea, the Commonwealth agreed to amend his murder charge to second-degree manslaughter and dismiss the count of attempted murder for the June 15th shooting; the remaining charges remained the same. He received a seventy-year sentence for the charges in 19-CR-321.

In addition, on the same day Shelton entered his conditional guilty plea, he agreed to the Commonwealth bringing an indictment by information under 23-CR-014 for the charge of tampering with a witness. Shelton committed that crime on December 19, 2021, while awaiting trial in this case. Shelton received a five-year sentence for that charge, and the circuit court ordered that

---

[7] As we discuss in Section II(C) below, the charges ultimately tried under indictment 19-CR-321 were the consolidation of two separate indictments: 19-CR-321 and 20-CR-74.

8

Shelton's five-year sentence under 23-CR-014 run consecutively to his seventy-year sentence under 19-CR-321 pursuant to KRS 533.060(3).

The version of KRS 439.3401 that was in effect at the time Shelton was sentenced[8] provided, in relevant part, that a "violent offender" was anyone who pled guilty to the commission of a capital offense, a Class A felony, or "[a] Class B felony involving the death of the victim or serious physical injury to a victim." KRS 439.3401(1)(a)-(c) (eff. July 12, 2022, to July 14, 2024).

Shelton pled guilty to complicity to attempted murder for the May 12th drive-by. Complicity to attempted murder is a Class B felony, KRS 506.010(4)(b); KRS 507.020; KRS 502.020, but it was undisputed that no victim suffered death or serious physical injury during the May 12th shooting. Shelton also pled guilty to second-degree manslaughter for the June 18th shooting that resulted in Savannah's death, but second-degree manslaughter is a Class C felony. KRS 507.040(2). Being a convicted felon in possession of a firearm is likewise, under the facts of this case, a Class C felony, KRS 527.040(2)(a), while tampering with a witness is a Class D felony. KRS 524.050(2). Thus, Shelton did not plead guilty to any offense that would have qualified him for violent offender status.

---

[8] A revised version of KRS 439.3401 went into effect after briefing was completed in this appeal. The current version of the statute provides that a violent offender is any person who is convicted of or pleads guilty to *any* felony involving the death of or serious physical injury to a victim. KRS 439.3401(1)(b)1. (eff. July 15, 2024).

9

It is clear to this Court from its review of the record that neither the Commonwealth nor the defense anticipated that Shelton would be classified as a violent offender under the terms of his plea agreement. But, during sentencing, the circuit court twice stated that it was "going to designate this as a violent offense." In response, both the Commonwealth and defense counsel attempted to explain to the court that Shelton did not qualify for violent offender status. But the court rejected their attempts, stating: "I'm going to sentence the way I see fit gentlemen. If y'all didn't understand you couldn't bind this court's hand in regard to that you should have considered that before you entered the plea."

No judge has the authority to sentence a defendant in violation of a sentencing statute duly enacted by the General Assembly. Accordingly, because Shelton did not plead guilty to an offense that qualified him for violent offender status, we hereby vacate the Graves Circuit Court's judgment and sentence on a conditional plea of guilty in 19-CR-321 and remand. On remand, the circuit court shall enter a judgment and sentence on a conditional plea of guilty that is identical in all respects to the now vacated order except that it shall not find that Shelton qualifies as a violent offender pursuant to KRS 439.3401. Nothing in this Opinion shall be construed to alter the fact that Shelton's five-year sentence for tampering with a witness under 23-CR-014 must run consecutive to his seventy-year sentence under 19-CR-321 pursuant to KRS 533.060(3).

**B. The circuit court did not err by denying Shelton's motion to dismiss indictment 19-CR-321.**

Shelton next asserts that the circuit court erred by denying Shelton's motion to dismiss indictment 19-CR-321 based on what Shelton alleged were four instances of false and misleading testimony by the lead detective before the grand jury. This argument was properly preserved by Shelton's motion to dismiss the indictment which was denied by the circuit court. This Court reviews a trial court's ruling on a motion to dismiss an indictment for abuse of discretion. *Mitchell v. Commonwealth*, 423 S.W.3d 152, 156 (Ky. 2014). We will accordingly uphold the circuit court's ruling unless we determine that it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

"Courts are extremely reluctant to scrutinize grand jury proceedings as there is a strong presumption of regularity that attaches to such proceedings." *Haney v. Commonwealth*, 653 S.W.3d 559, 569 (Ky. 2022) (quoting *Commonwealth v. Baker*, 11 S.W.3d 585, 588 (Ky. App. 2000)). Nevertheless, this Court has recognized a trial court's "supervisory power to dismiss an indictment where a prosecutor knowingly or intentionally presents false, misleading or perjured testimony to the grand jury that results in actual prejudice to the defendant." *Haney*, 653 S.W.3d at 569 (quoting *Baker*, 11 S.W.3d at 588). To be granted relief on this basis, a defendant must show that there was "a flagrant abuse of the grand jury process" resulting in actual prejudice to the defendant and that "the grand jury was deprived of

11

'autonomous and unbiased judgment.'" *Id.* And, at bottom, "no indictment shall be quashed. . . on the ground that there was not sufficient evidence before the grand jury to support the indictment." RCr[9] 5.10.

Although Shelton was charged under two different grand jury indictments that were later consolidated (19-CR-321 and 20-CR-74) he argues for reversal in relation to only the 19-CR-321 grand jury proceedings. Under that indictment Shelton was charged in relation to the May 12th and June 18th shootings, being a felon in possession of a handgun, and being a PFO 1st.

Shelton first takes issue with the lead detective, Nathan Young, mentioning that there had been five different shootings during the spring of 2019. Shelton argues this was misleading and inflammatory because Shelton was only charged with two shootings under the indictment. We disagree. The grand jury transcript clearly reflects that the two times Det. Young mentioned there had been five shootings it was within the context of explaining that the evidence may become confusing. The first time, he said:

> It's going to get kind of—a little difficult so—literally, in a matter of a few weeks, we had five shootings, so I'm going to have to kind of walk you through some of this. So if you get confused, tell me, stop me in the middle of it. Okay? We'll start with the first one. It was May 12, 2019.

The second time, Det. Young was explaining his investigation into the June 18th shooting. He said:

> Anyway, so based off of that, I—I got the—the warrants. Neither Dimetri Ross or Stanford Shelton would talk to me. They—they lawyered up as soon as I brought their warrants for the—for the

---

[9] Kentucky Rule of Criminal Procedure.

> murder.  Hayden, obviously, went on a little travel for a couple months before she turned herself in.  So we're just going to kind of get a little muddy, so we're—now, granted, you're talking about Jodeci, Marcia, and Hayden who are all three drug addicts, who can't keep up day to day what's happening.  You also have to realize we've had five shootings in like three weeks.  Okay?

Nothing about this testimony constituted a flagrant abuse of the grand jury process nor does it indicate in any way that the grand jury was deprived of autonomous and unbiased judgment.  *Haney*, 653 S.W.3d at 569.

The second instance of which Shelton complains is Det. Young's testimony about a television inside Robin's house on South 6th Street being hit with a bullet when the two unknown individuals shot at Shelton and Hayden on June 18th.  Shelton argues that this testimony would have confused the grand jury and made it infer that Shelton was the perpetrator of that shooting and not the victim.  Again, the grand jury transcript clearly refutes this, as Det. Young made it clear that Shelton was a victim of that shooting and that the shooting that killed Savannah was in retaliation for it:

> **Det. Young:** June 18th is the day of the actual homicide, okay?  So at 9:30 p.m. we get a call of shots fired on South 6th Street.  All right?  A lady, Robin Moxey, a bullet had went through her residence, hit a TV.  I think they found a—a shell casing out there, but that was it.  No big deal.  10:30 [p.m.] is when we get the call of shots fired at 702 West Lee Street from the 11-year-old girl.  911 call says, "My mama's been shot."
>
> . . .
>
> Get back on track here.  So Hayden says that, she said that—this is where the South 6th Street comes in.  She stated she was at South 6th Street at the—basically at the intersection where Robin Moxey's house was shot.  She stated that Mr. Shelton was inside the window talking to her.  And she stated that two black males came up—or started walking up from behind her and started shooting at Shelton, basically, and towards her.

13

. . .

> [T]hey think who—they think shot at them is [Dale], and they went over there to retaliate.
>
> **Grand Juror:** So that was on the same night?
>
> **Det. Young:** Within an hour.
>
> **Grand Juror:** Okay.
>
> **Det. Young:** The South 6th Street shooting and the West Lee Street happened within an hour.
>
> **Grand Juror:** Okay.

It was accordingly made clear to the jury that Shelton was not the perpetrator of the shooting at Robin's house, and nothing about this testimony warranted dismissal of the indictment.

The third piece of testimony Shelton challenges is Det. Young's explanation of where Jane was in relation to Savannah when the shooting occurred. Det. Young explained:

> Basically, this is how it happens. So Savannah is sitting on the couch. Which, unfortunately, she had just moved two days prior to where she was. She was—her daughter was sitting in her lap. She was braiding her daughter's hair. Next thing you know, shots fired, hit her in the neck, she falls over. Her daughter, you know, miraculously—it had to have almost hit her hair when it hit her, when it hit her mom. So like I said, her daughter ran into another room, was hiding, and then called 911.

Shelton alleges this testimony was false because Jane told the police that she was in a different room when Savannah was shot.[10] Jane's trial testimony was

---

[10] Shelton also argues before this Court that Det. Young identifying Jane as Savannah's daughter rather than her stepdaughter was grounds for dismissal. However, this argument was never made before the circuit court and is accordingly

14

that she was in the floor between Savannah's legs getting her hair braided when Savannah was shot and that she fled to the back of the house after the shots had been fired. And, at any rate, where Jane was in relation to Savannah had no bearing on any of the counts being presented to the grand jury. *Cf. Baker*, 11 S.W.3d at 589-90. Shelton was not charged with any crimes in relation to Jane, such as wanton endangerment, and the only issues the grand jury was charged with addressing in relation to June 18th were whether Shelton intentionally shot into Savannah's home, thereby causing her death, and whether he was a felon in possession of a handgun when he did so. This testimony did not meet the standard for dismissal of the indictment.

The final portion of Det. Young's testimony Shelton asserts warranted dismissal of his indictment concerned video footage of the shootings. Prior to any of the spring 2019 shootings, Dale had been under investigation by the ATF.[11] As part of its investigation, the ATF had a video camera pointed at Dale's house. This Court was not provided with any of the ATF's video footage, nor was any of the footage played at trial. However, we discern from statements made by both parties that the footage of the May 12th shooting clearly showed the car from which the shots were fired as well as barrel flashes from the gun. However, during the June 15th and June 18th shootings the camera was, for whatever reason, zoomed in too close to see the road when the

_____

unpreserved for our review and Shelton has not requested palpable error review of the argument. *See* RCr 10.26.

[11] Bureau of Alcohol, Tobacco, Firearms, and Explosives.

15

shootings occurred. When discussing the June 18 shooting, Det. Young testified before the grand jury as follows:

> As far as the video, we actually got it on video. Now, you cannot see the car because, unfortunately, during one of the times we were looking at [Dale's] house on our camera or the federal camera, you can zoom in, zoom out, we can get license plates, different things like that. It was zoomed in somewhat, so we couldn't see the road. So you could see the car come by and—or you could see part—or the headlights come by, and you can see the flashes of the gun. You can't see the exact car. And then you see, obviously her mom—or the little girl come out and everyone else when the police show up.

During the hearing on Shelton's motion to dismiss, the Commonwealth conceded that the footage from June 18th did not show the car coming by, the car's headlights, or the flashes from the gun, and Det. Young acknowledged that he mistakenly gave the grand jury a description of the May 12th footage while he was discussing the June 18th shooting. While this was a misstatement of the evidence, we cannot hold it was a flagrant abuse of the grand jury process or that it deprived the grand jury of its autonomous and unbiased judgment. *Haney*, 653 S.W.3d at 569. Det. Young also detailed Hayden's statements to him regarding the June 18th shooting to the grand jury, which were consistent with her trial testimony. There was therefore sufficient evidence apart from the surveillance footage for the grand jury to conclude a crime had been committed. *See* RCr 5.10.

Based on the foregoing, we cannot hold that the circuit court abused its discretion by denying Shelton's motion to dismiss indictment 19-CR-321 and affirm the ruling of the trial court.

16

**C. The circuit court did not err by denying Shelton's motion to sever or by granting the Commonwealth's motion to consolidate.**

As previously noted, Shelton was initially charged under two separate indictments: 19-CR-321 and 20-CR-74. The Counts charged under 19-CR-321, issued in September 2019, were complicity to attempted murder for the May 12th shooting, murder for the June 18th shooting, felon in possession of a handgun, and PFO 1st. The sole count under 20-CR-74, issued in March 2020, was attempted murder for the June 15th shooting.

On March 24, 2020, the Commonwealth filed a motion to consolidate the two indictments for the purposes of trial. Rather than filing a direct response to the Commonwealth's motion, Shelton filed a motion for the Counts under 19-CR-321 to be severed and tried separately. At a subsequent hearing on the competing motions, defense counsel objected to the Commonwealth's motion to consolidate the two indictments for trial. The circuit court ultimately denied Shelton's motion to sever[12] and granted the Commonwealth's motion to consolidate.

This Court reviews a trial court's ruling on both a motion to sever and a motion to consolidate for abuse of discretion. *Edmonds v. Commonwealth*, 189 S.W.3d 558, 562 (Ky. 2006); *Elam v. Commonwealth*, 500 S.W.3d 818, 824 (Ky. 2016). We are accordingly without authority to reverse the circuit court's rulings unless we conclude that they were "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

---

[12] Except for the charge of felon in possession of a handgun.

17

RCr 6.18 permits joinder of two or more offenses under the same indictment "if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan," and RCr 9.12 permits a trial court to order the consolidation of two or more indictments for trial if the indictments "could have been joined in a single indictment[,]" i.e., if they meet one of RCr 6.18's requirements. As this Court discussed in the seminal case of *Peacher v. Commonwealth*, the "same or similar character" requirement of RCr 6.18, and by extension RCr 9.12, may be satisfied by crimes

> such as similar rapes, *Moreland v. Commonwealth*, 322 S.W.3d 66 (Ky.2010);[13] *Edmonds v. Commonwealth*, 189 S.W.3d 558 (Ky.2006); *Cannon v. Commonwealth*, 777 S.W.2d 591 (Ky.1989); separate burglaries of the same residence and related offenses against the same victim, *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky.2002); or the closely proximate and similarly inflicted abuse and murder of the same child victim, *Commonwealth v. Collins*, 933 S.W.2d 811 (Ky.1996).

391 S.W.3d 821, 837 (Ky. 2013). We see no reason why "similar drive-by shootings on the same residence with the same intended victim" could not be included in this list. Furthermore, if the offenses in *Peacher* were similar enough to warrant joinder, then the offenses at issue herein were certainly of the same or similar enough character to warrant joinder and consolidation. *Peacher* addressed the joinder of offenses related to the abuse of two different toddler-aged children, Christopher and Wyatt. *Id.* at 829. While no amount of

---

[13] *Overruled on other grounds by Edmonds v. Commonwealth*, 433 S.W.3d 309 (Ky. 2014).

18

child abuse is acceptable, the children suffered very different respective injuries while in the temporary care of the defendants. *Id.* at 829-33. Wyatt had bruising on the back of one of his ears. *Id.* at 833. A medical expert testified the ears are a difficult area to bruise due to a lack of blood flow, and the bruising therefore indicated Wyatt had "likely been dealt a sharp blow to the side of the head." *Id.* Christopher had similar bruising on and behind his ears, but he also had numerous injuries indicating he had been violently shaken, including brain hemorrhaging and swelling and bruising on the sides of his neck; extreme blunt force trauma to the torso such that his only unharmed organs were his heart and lungs; and extensive bruising to his genitals and groin. *Id.* at 830. And Christopher's injuries, unlike Wyatt's, were fatal. *Id.* The *Peacher* Court nonetheless held that "the abuse of Christopher and Wyatt at the same place during the same two-day period and involving the infliction of similar bruising to the ears of both children was sufficiently similar to permit joinder under the 'same or similar' offenses portion of RCr 6.18." *Id.* at 837.

Here, in each of the three shootings, Shelton used either subterfuge or coercion to get an otherwise unwilling female acquaintance to drive both himself and Ross to Dale's home. In each, the drivers were instructed to drive by Dale's house once, and then Shelton directed the driver to drive past it a second time, at which point shots were fired at the home by either Shelton or Ross. In each, Dale was the intended target, and each was motivated by the animosity Shelton and Ross felt towards Dale, whether that hatred was entirely

motivated by gang-related issues, woman-related issues, or some combination of the two. We accordingly hold that the May 12th shooting and the June 18th shooting were of the same or similar character sufficient to justify joinder pursuant to RCr 6.18 under indictment 19-CR-321 and further hold that the June 15th shooting charged under indictment 20-CR-74 was of the same or similar character to both the May 12th and the May 18th shooting such that consolidation of indictments 19-CR-321 and 20-CR-74 for the purposes of trial was proper.

Notwithstanding, our inquiry does not end there, as RCr 8.31 further mandates that a trial court "shall order separate trials" if "it appears that a defendant or the Commonwealth will be prejudiced by a joinder of separate offenses. . .in an indictment. . . or by joinder for trial." As the *Peacher* Court discussed, due to the certain degree of prejudice inherent in the joinder of offenses, "the 'prejudice' calling for severance or other relief under [RCr 8.31][14] is 'undue prejudice,' *i.e.*, prejudice that goes beyond the inherent prejudice to that which is unnecessary and unreasonable." 391 S.W.3d at 838. This Court went on to say that "the risk of undue prejudice from joinder is particularly acute when[,]" as in this case, "joinder is premised on the 'same or similar' offense rubric of the joinder rule." *Id.* Accordingly, to determine whether undue prejudice resulted from joinder, we ask "with KRE[15] 404(b) particularly

---

[14] Formerly RCr 9.16.

[15] Kentucky Rule of Evidence.

in mind, 'whether evidence necessary to prove each offense would have been admissible in a separate trial of the other.'" *Id.*

KRE 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, evidence of other crimes, wrongs, or acts may be admissible "[i]f offered for some other purpose" such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" or if the evidence is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(1)-(2). The Commonwealth argues that evidence of each of the three shootings would have been admissible in separate trials for each because each shooting demonstrated Shelton's plan to kill Dale, his motives for wanting to do so, and the evidence of each of the shootings was inextricably intertwined with evidence of the other two shootings. We agree.

All three of the drive-by shootings took place with a thirty-seven-day window of time. Each of the shootings had the common thread of being motivated by both Shelton's and Ross' desire for Dale to die and Dale was the intended target each time. To accomplish the goal of killing Dale, Dale's home was shot at in all three of the shootings. All three shootings were therefore unsuccessful attempts to commit the same murder; they were not three unrelated decisions to shoot at Dale or another individual for three unrelated reasons. The only true differences between any of the shootings were the date

21

on which they occurred, the driver of the car, and the individuals present in the car apart from Shelton and Ross. We therefore hold that the evidence of each of the three shootings would have been mutually admissible in separate trials for each pursuant to KRE 404(b) and that Shelton was not unduly prejudiced by the joinder and consolidation of the offenses for trial.

Indeed, the only prejudice Shelton has articulated to this Court is that "the Commonwealth [bolstered] their weak evidence to get a conviction." *See Peacher*, 391 S.W.3d at 837-38 (discussing that a defendant may be prejudiced by the joinder of offenses by "the risk that evidence of one crime will be used inappropriately as evidence of another, or that evidence will be used cumulatively, a strong case bolstering a weak one"). But Shelton has not explained which of the three shootings had weak evidence nor which of the three had strong evidence that bolstered the evidence of one or both of the other two. In any event, we disagree with his contention.

Regarding the May 12th shooting, two different witnesses, Gwynth and Ross, testified that Shelton was in the car at the time of the shooting. And although Shelton was not the shooter on that day, Gwynth testified that Shelton was the reason they drove past Dale's house and that he provided Ross with a gun prior to the shooting. Concerning the June 15th shooting, two different witnesses, this time Marcia and Jodeci, testified that Shelton was in the car during the shooting although neither could say with certainty whether Shelton, Ross, or both had fired shots. Finally, for the June 18th shooting, both Hayden and Ross provided uncontroverted testimony that Shelton was the

22

one that fired shots at Dale's house. This Court therefore fails to see how weak evidence regarding one of these shootings was improperly bolstered by strong evidence of one of the other shootings and, based on the foregoing, we affirm.

**D. The circuit court did not err by denying Shelton's motion to disqualify the Graves County Commonwealth's Attorney's Office.**

Shelton next asserts that the circuit court reversibly erred by denying his motion to disqualify the Graves County Commonwealth's Attorney's Office (Commonwealth's Attorney) from prosecuting this case on the basis that it violated his Sixth Amendment right to counsel by inadvertently intercepting a letter he sent to a member of his defense team. U.S. Const. amend. VI; *U.S. v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973) ("[T]he essence of the Sixth Amendment right is, indeed, privacy of communication with counsel.").

After Shelton was arrested, he was housed for a time at the Christian County Jail due to the Graves County Jail being destroyed by a tornado. On or about November 4, 2022, the Commonwealth's Attorney received information that Shelton may have been sending letters that pertained to witnesses. The Commonwealth's Attorney accordingly requested that the jail intercept any letters being sent by Shelton but specifically directed the jail not to intercept letters being sent to or from members of Shelton's defense team. On November 11, 2022, the jail inadvertently provided the Commonwealth's Attorney with a letter sent by Shelton to Ilker Onen who had recently been hired by the defense as a mitigation investigator. The Commonwealth filed a notice of filing on December 19, 2022, informing the circuit court and the defense that it had received the letter and included the letter as an attachment to its filing.

Nine days later Shelton filed a combined motion to disqualify the Commonwealth's Attorney from prosecuting the case and to exclude the Ilker letter from being admitted at trial. The circuit court denied the motion to disqualify. It reasoned that the Commonwealth Attorney's inadvertent possession of the letter did not prejudice Shelton because it contained no information pertaining to the crimes for which Shelton was being tried. Notwithstanding, the court ruled that the Commonwealth was prohibited from referencing or introducing the Ilker letter at trial.

Shelton's argument that the circuit court erred by denying his motion to disqualify is properly preserved for our review. This Court reviews a trial court's denial of a defendant's motion to disqualify a prosecutor for abuse of discretion. *Ward v. Commonwealth*, 587 S.W.3d 312, 319 (Ky. 2019). We will accordingly reverse the circuit court's ruling only if we find it to be "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

"Any prosecuting attorney may be disqualified by the court in which the proceeding is presently pending, upon a showing of actual prejudice." KRS 15.733(3). Shelton's appellant brief to this Court concedes that he "cannot affirmatively show actual prejudice," and argues prejudice should instead be presumed. We decline to presume prejudice, as the case law of this Court and the United States Supreme Court is clear that "even when the government does purposefully intrude into the attorney-client relationship, prejudice to the defendant must be shown." *Brown v. Commonwealth*, 416 S.W.3d 302, 306

24

(Ky. 2013) (citing *U.S. v. Morrison*, 449 U.S. 361 (1981)). Instead, this Court will continue to apply the well-established factors to be considered when addressing an argument that the government has violated a defendant's right to counsel:

> 1) whether the presence of the informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of the informant was the result of other inadvertent occurrences;
>
> 2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the informant's intrusion;
>
> 3) whether any information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and
>
> 4) whether the details about trial preparations were learned by the government.

*Brown*, 416 S.W.3d at 306-07 (quoting *U.S. v. Steele*, 727 F.2d 580 (6th Cir. 1984)); *accord Ward*, 587 S.W.3d at 321; *Weatherford v. Bursey*, 429 U.S. 545, 554 (1977).

In this case, the "informant" was the jail personnel that intercepted Shelton's mail upon the request of the Commonwealth's Attorney. However, the Commonwealth's Attorney explicitly directed jail personnel not to intercept privileged, attorney-client material and its receipt of the Ilker letter was accidental. The circuit court ordered that the Commonwealth was not permitted to admit or reference the Ilker letter at trial, and the Commonwealth obeyed that order. Moreover, the Commonwealth did not otherwise obtain any evidence from the letter that was used against Shelton at trial, and there is no

25

evidence of record that the information contained in the Ilker letter has been otherwise used against Shelton to his substantial detriment. Finally, without revealing the contents of the letter, this Court can confidently state that it had nothing to do with trial strategy or mitigation evidence. The defense's trial preparations were therefore clearly not revealed to the Commonwealth's Attorney from the letter.

The Commonwealth's Attorney did not violate Shelton's Sixth Amendment right to counsel, Shelton was not prejudiced, and the circuit court did not abuse its discretion by denying his motion to disqualify. We affirm.

## E. The circuit court did not err by denying Shelton's motion to exclude.

For his final assertion, Shelton argues that the circuit court reversibly erred by denying his motion to exclude a different letter he wrote that was intercepted by jail personnel after it was returned as undeliverable.

At some point during his pre-trial incarceration Shelton was moved from the Christian County Jail to the McCracken County Jail. On January 5, 2023, the Commonwealth filed a motion in limine seeking leave to reference a letter in its opening statement that had been sent by Shelton to an individual identified as "Bigfats" while he was incarcerated in the McCracken County Jail. The letter had been returned to the jail as undeliverable and was opened and read by jail staff upon its return. According to the Commonwealth's motion in limine, in the letter Shelton asked Bigfats to testify that Shelton was with him on the night of the June 18 shooting.

26

During a hearing on the motion in limine, the Commonwealth clarified that there were actually two letters for which it was seeking a ruling. This Court was not provided with either of the letters in the record on appeal, but we discern from the video record that one of the letters was the Bigfats letter and the other letter was addressed to an April Galbraith. The Commonwealth explained that both of the letters had been returned to McCracken County Jail as undeliverable and that as they were coming in jail staff opened them, read them, and turned them over to law enforcement on the basis that Shelton had been trying to establish alibi witnesses in both letters. Law enforcement in turn gave them to the Commonwealth. The Commonwealth expected both letters to be admissible at trial and had filed its motion in limine to verify that it would be permitted to reference both letters in its opening statements if it so chose.

Defense counsel objected and argued that the letters should not be admissible at trial because Department of Corrections (DOC) policies only permit returned mail to be opened to determine if contraband is enclosed. The defense contended that because Shelton's attempt to establish an alibi witness was not contraband, the jail had no right to confiscate the letters and give them to law enforcement or the Commonwealth. The circuit court ruled that the Commonwealth could not reference the letters in opening statements but reserved ruling on their admissibility.

On the second day of Shelton's trial, during Detective Lieutenant Rick Farmer's[16] testimony, he stated that in March 2020 he was contacted by an officer at the McCracken County Jail who told him they had intercepted a letter. Before he could testify further, defense counsel requested to approach the bench. During a side bench the defense objected to the letter's admission on the basis that it had been illegally seized. Counsel reiterated his assertion that DOC policy only allowed inspection of returned mail for contraband, that Shelton's attempt to establish an alibi was not contraband, and that the letter should therefore have been returned to Shelton. The court asked whether defense counsel had the McCracken County Jail's policies regarding undeliverable returned mail; he did not. The Commonwealth argued that, to its understanding, the jail's policy was to routinely open any incoming mail. It further pointed out that jails routinely record inmate phone calls and that it would be nonsensical to draw a distinction between writing a letter and making a phone call. The court overruled the defense's objection as follows:

> **Court:** Your objection is noted and could be well-taken except for the fact that this is coming back into the jail and it's my understanding that no one has a copy of their policies, McCracken's policies—
>
> **Defense Counsel:** Judge, the only policy I have is DOC's policy as far as—
>
> **Court:** Well that may be, but he wasn't a DOC prisoner at the time was he?

---

[16] At the time of his testimony, Officer Farmer was a school resource officer, but at the time the Shelton's crimes were being investigated he was a detective lieutenant with the Mayfield Police Department.

> **Defense Counsel:** Judge I think it's hard for them to make that distinction [inaudible].
>
> **Court:** Well the distinction I'm making is this was coming back into the jail, and they have a right to inspect anything coming in whether it's in the pocket of somebody or whether it's in an envelope, or whatever it is just for safety. And once they discovered it, they contacted Mayfield PD. Alright, your objection is noted for the record.

When questioning resumed, Det. Lt. Farmer reiterated how he came to be in possession of the letter and stated that he gave it to Det. Young. The Commonwealth then asked him to open a sealed evidence envelope that was ostensibly supposed to contain both the Bigfats letter and the April Galbraith letter. However, to the Commonwealth's obvious surprise, the envelope contained only the Galbraith letter. The Galbraith letter was marked and admitted into evidence; no part of it was read aloud. The Commonwealth then asked to approach the bench and explained it was not able to locate the original Bigfats letter at that time and wanted to introduce a copy of it instead. Defense counsel objected on the basis of the best evidence rule. *See* KRE 1002. The Commonwealth withdrew its request and explained that Det. Young was attempting to locate the original copy of the Bigfats letter, and that the Commonwealth would question Det. Young about the letter if he was able to locate it. However, when Det. Young later testified the Bigfats letter was neither mentioned nor introduced into evidence.

Accordingly, Shelton's argument before this Court that the circuit court erred by denying his motion to exclude is preserved insofar as it concerns the

Galbraith letter.[17] A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *See, e.g., Meece v. Commonwealth*, 348 S.W.3d 627, 645 (Ky. 2011). This Court is accordingly without authority to reverse the circuit court 's ruling on Shelton's motion to exclude unless we conclude it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

Before this Court, Shelton has renewed his argument that the jail's seizure of the letter was violative of DOC policy and that the warrantless seizure of the letter violated his Fourth Amendment rights. U.S. Const. amend. IV. The Commonwealth responds that Shelton's argument is directly contradictory to this Court's holding in *Thurman v. Commonwealth*, 975 S.W.2d 888, 989-99 (Ky. 1998) and, even if the admission of the letter was error, it was harmless. For the reasons that follow, we agree with the Commonwealth.

First, as astutely noted by the circuit court, Shelton was not under a DOC order of commitment at the time the letter was seized and was therefore not a DOC inmate. *See* KRS 532.100. The DOC's policies concerning returned mail are therefore irrelevant, and the policies of the McCracken County Jail are not in the record before us. Nevertheless, our jurisprudence is clear that the practice of confiscating non-privileged inmate correspondence and providing it

---

[17] Shelton also asserts that the circuit court abused its discretion by denying its motion to exclude the letter Shelton sent to Ilker Onen. But, as we explained in Section II(D) of this Opinion, the circuit court granted Shelton's motion to exclude the Ilker letter and the Commonwealth did not reference or attempt to introduce that letter at trial.

30

to the prosecution for use at trial does not violate the Fourth Amendment's proscription against unlawful search and seizure.

In *Thurman*, the defendant and two co-defendants were charged with murder, kidnapping, and robbery. 975 S.W.2d at 890. Prior to trial, the defendant, who was incarcerated, wrote a letter to one of his co-defendants who was being housed at a different facility. *Id.* at 898. The letter was intercepted by jail personnel at the co-defendant's facility and given to the prosecution and a portion of the letter was read to the jury at trial. *Id.* This Court held that "the policy of providing seized correspondence to prosecuting authorities [does not] violate the Fourth Amendment proscription against unreasonable searches and seizures[]" and that the defendant's "constitutional rights were not violated by the interception, seizure and subsequent use at trial of his. . . letter to his co-defendant." *Id.* at 899.

In reaching its holding the *Thurman* Court relied upon the now over 100-year-old U.S. Supreme Court opinion of *Stroud v. U.S.*, 251 U.S. 15 (1919). 975 S.W.2d at 899. In *Stroud*, a prisoner at Leavenworth was convicted of the first-degree murder of a guard. 251 U.S. at 16. At the prisoner's trial, "[c]ertain letters were offered. . . containing expressions tending to establish the guilt of the accused." *Id.* at 21. The letters were written by the prisoner after the guard was murdered, and "under the practice and discipline of the prison were turned over ultimately to the warden, who furnished them to the district attorney." *Id.* In concluding that there was no "unreasonable search and seizure, in violation of his constitutional rights[]" the *Stroud* Court found it

31

determinative that the prisoner voluntarily wrote the letters, no threat or coercion was used to obtain them, and that they were not seized without process. *Id.* 21-22. Rather, "[t]hey came into the possession of the officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution." *Id.* at 21.

Shelton attempts to distinguish the facts of *Thurman* on the basis that the correspondence in *Thurman* was sent from one inmate to another inmate while Shelton's letter was sent to a civilian. This is a distinction without a difference as the parties to a given correspondence are not the dispositive factor. Indeed, there was no indication in *Stroud* that the seized letters were inmate-to-inmate letters, nor was there any consideration of that fact in *Yager v. Commonwealth*, 407 S.W.2d 413 (Ky. 1966). The *Yager* Court likewise held that the defendant's Fourth Amendment rights were not violated by the Commonwealth's introduction of a letter intercepted by jail personnel. *Id.* at 416. Additionally, the Court opined that, "Undoubtedly, the prison authorities had the right to intercept appellant's mail for security reasons[,]" and that the "crucial question" was whether the introduction of the seized mail was prejudicial. *Id.*

Thus, this Court holds that the admission of the Galbraith letter was not error. And, even assuming the admission of the letter was error, it was harmless. "A non-constitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Meyers v. Commonwealth*, 381 S.W.3d 280,

32

285 (Ky. 2012). Shelton has asserted that the introduction of the letter into evidence prejudiced him, but he has not explained how. In the letter, Shelton was attempting to establish an alibi witness for the June 18 shooting that resulted in Savanah's death. As Shelton pled guilty before the case was submitted to the jury, this Court has no way of knowing whether the jury would have convicted Shelton in relation to the June 18 shooting, nor under which theory of culpability. Nevertheless, assuming the jury found him guilty, the introduction of the Galbraith letter would not have substantially swayed that verdict.

Two witnesses that were in the vehicle with Shelton at the time of the June 18 shooting, Hayden and Ross, both testified that Shelton had a motive to harm Dale. Both Hayden and Ross also provided uncontradicted testimony that Shelton was the shooter during the June 18 drive-by. In addition, Shelton's former girlfriend Kayla testified regarding a letter Shelton sent her after he was arrested that she in turn gave to law enforcement. In the letter, Shelton wrote: "I want you to ask my family, anybody you are cool with, for fundraising for Savannah's funeral. Help me right my last wrong, even if it's only twenty dollars." Thus, Shelton's letter to Galbraith attempting to establish an alibi witness for the night of June 18 would have constituted only marginal additional proof of his guilt. The circuit court's denial of Shelton's motion to exclude the Galbraith letter was accordingly not arbitrary, unreasonable, unfair, or unsupported by sound legal principles and we affirm.

33

## III.   CONCLUSION

Shelton's convictions for second-degree manslaughter, complicity to attempted murder, being a convicted felon in possession of a handgun, and being a PFO 1st are affirmed.  His sentencing order is hereby vacated and this case is remanded for correction of his sentencing order in accordance with this Opinion.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Kayley Valentien Barnes
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Jenny Lynn Sanders
Assistant Attorney General